## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AVELO AIRLINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL MEDIATION BOARD, | ) | Civil Action No. 22-cv-562 |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

Plaintiff Avelo Airlines, Inc. ("Avelo"), by counsel, states as follows for its Complaint for Declaratory and Injunctive Relief against Defendant National Mediation Board ("NMB" or "Board").

1. The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, guarantees to a "majority" of a craft or class of airline employees the right to decide whether to be represented by a union for purposes of collective bargaining. Despite this explicit statutory mandate, the Board has directed that a union election proceed among Avelo's Flight Attendants that excludes the overwhelming majority of the Flight Attendants. The Board's action unfairly disenfranchises a significant majority of Avelo's Flight Attendants and constitutes a gross violation of the Board's statutory obligations under the RLA. The Board's decision imposes direct and irreparable harm on those Avelo Flight Attendants who have been denied the right to have their voice heard on the critical question of union representation, and on Avelo as well, which could find itself having to negotiate with a union that was not lawfully elected by a vote involving a majority of its Flight Attendants. This Court should enjoin the Board's gross violation of the RLA.

## PARTIES

2.     Plaintiff Avelo Airlines, Inc. ("Avelo") is a new entrant in the airline industry, offering low fares to customers on both coasts of the United States from bases in Burbank, California and New Haven, Connecticut.  It is a common carrier by air within the meaning of RLA Section 201, 45 U.S.C. § 181.

3.     Defendant National Mediation Board ("NMB" or "Board") is "an independent U.S. federal government agency that facilitates labor-management relations within the nation's railroad and airline industries."  NMB, *Mission & Organization*, https://tinyurl.com/yckm9hae (last visited Mar. 2, 2022).  It is headed by a three-person Board whose members are nominated by the President and confirmed by the U.S. Senate.  *Id.*  Two of the three members of the Board are aligned with the President's political party, while the third is aligned with the other party.  On January 25, 2022, Democrat Deirdre Hamilton was sworn in as the third member of the Board, joining incumbent members Linda Puchala (Democrat) and Gerald Fauth (Republican).

4.     As relevant to this action, the NMB is authorized—and obligated—to conduct majoritarian elections among airline and railway employees "to determine who shall be the representative of the [employee] craft or class" for purposes of collective bargaining.  RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth.

## JURISDICTION AND VENUE

5.     The cause of action arises under the RLA, 45 U.S.C. § 151 *et seq.*  This case therefore raises a federal question, and this Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this action is brought in the district in which the Board sits and all challenged events alleged herein transpired in Washington, D.C.

## STATEMENT OF FACTS

### The RLA Guarantees that a Majority of a Craft or Class has the Right to Determine Whether to be Represented by a Union

7.      The RLA governs labor relations in the airline and rail industries.  The RLA safeguards the right of employees within those industries "to organize and bargain collectively through representatives of their own choosing."  RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth.

8.      A union that seeks to represent a group of airline or rail employees (known as a "craft or class") starts the process by filing an application requesting that the Board conduct an election among the members of the craft or class.  *See* 29 C.F.R. § 1203.2.  The RLA requires that the union's application be supported by a showing of interest from at least 50% of the craft or class.  RLA Section 2, Twelfth, 45 U.S.C. § 152, Twelfth.  To establish the required showing of interest, the union submits signed employee "authorization cards" to the Board with its application.  29 C.F.R. §§ 1203.2, 1206.2. If the union demonstrates the necessary showing of interest, the NMB conducts an election to determine whether the employees within the craft or class wish to be represented by the applicant union, by some other union, or to remain unrepresented.  If the union fails to meet the showing of interest, the Board dismisses its application.

9.      The RLA mandates that the "*majority* of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth (emphasis added).  This legislative guarantee is "established on the democratic theory that the majority of the craft or class of employees of the carrier should have authority to make agreements for the entire craft or class."  *Del., Lackawanna & W. R.R. Co.*, 1 NMB 43, 48–49 (1937).  The NMB has long recognized that in disputes "concerning who should participate in the selection of representatives for such collective bargaining by the majority, th[e] Board, or a committee of neutrals appointed by it, should determine by secret ballot or other appropriate means who were the representatives of the majority."  *Id.*  Moreover, the Board must

resolve disputes and conduct elections "in accordance with the requirements" of the RLA.  RLA

Section 2, Ninth, 45 U.S.C. § 152, Ninth.  The Board is therefore "bound by the law, and the law

requires that a majority of the craft or class of employees on any carrier shall have the right to

determine who shall be the representative of the craft or class." *N.Y. Cent. R.R. Co.*, 1 NMB 303, 312

(1945).

10.     The Board has established rules regarding employee eligibility to participate in a union

election, which are set forth in its Representation Manual.  The Board has held that to be eligible to

participate in an election, an employee must have an employee-employer relationship with the airline

as of the eligibility "cut-off date," which is generally the last day of the last payroll period ending before

the day on which the NMB received the union's application.  *See* NMB Representation Manual §§ 2.3,

2.4 (2022).  That means that employees who are hired after the eligibility cut-off date, but before the

conclusion of the election, typically cannot participate in the election.

11.     Employees who are on the eligibility list initially may lose their eligibility to participate

in the election if they have a change in status prior to the conclusion of the voting period.  The Board

refers to these as "status changes."  *Id.* § 12.3.  Examples of status changes include the employee's

resignation, termination, retirement, promotion to a management position, or transfer out of the craft

or class.  *Id.*

12.     The Board has previously modified the default eligibility cut-off date based on

"extraordinary or unusual circumstances"—including when there has been a substantial change in the

composition of the craft or class.  *See Compass Airlines*, 35 NMB 14, 21 (2007) ("The Board has

recognized that substantial turn-over of employees in the craft or class is an extraordinary or unusual

circumstance that warrants modifying the cut-off date."); *USAir*, 10 NMB 495 (1983) (modifying the

cut-off date where following the "Board's normal procedures" would result in "less than a majority of

the craft or class [being] eligible to vote"); *Piedmont Airlines*, 9 NMB 41, 45 (1981) (revising cut-off date

by almost five years in light of turnover of more than half the craft or class). For example, in *Compass*, the Board modified the cut-off date by two and a half months because the craft or class at a start-up airline more than tripled between when the union filed its application and the Board authorized the election. In keeping with the RLA's majority requirement, the Board modified the cut-off date in *Compass* to account for the airline's recent hires, thus avoiding a situation in which "significantly less than a majority of the craft or class will be eligible to vote." 35 NMB at 21.

13. At the conclusion of a majoritarian election, the Board either certifies a representative or dismisses the case. RLA Section 2, Ninth, 45. U.S.C. § 152, Ninth. The RLA requires an airline to bargain with a certified representative immediately "[u]pon receipt of such certification." *Id.*

14. The Board conducts elections among all employees in the craft or class throughout the entire country, rather than at a particular geographic location. Thus, the Board has not historically used in-person balloting to conduct its elections. For years, the Board used mail ballots in its elections. Since 2007, and until recently, it conducted its elections via a combination of telephonic and internet voting.

15. In September 2021, the Board announced that its contract with its current electronic voting vendor had expired with no possibility of extension, and that its solicitation for the contracts had not resulted in any bids. Therefore, the Board began a process to build an electronic voting system internally. The Board stated that in the meantime it would return to using mail ballots in its representation elections.

## Avelo's Beginning and Growth

16. Avelo's founders created the company to provide customers with affordable and convenient flights. On April 28, 2021, Avelo's inaugural flight departed the Hollywood Burbank Airport in California—the only base Avelo had at the time. On that date, Avelo boasted eleven non-

stop, unserved routes starting at $19.  Avelo, *Wheels Up: Avelo Airlines Takes Off with First Flight Between Burbank and Santa Rosa* (Apr. 28, 2021), https://tinyurl.com/56fjvn4e.

17.     On May 6, 2021, Avelo publicly announced plans to open its first East Coast base, at Tweed New Haven Airport in Connecticut.  Avelo, *Avelo Expands to East Coast; Announces Tweed New Haven Airport Base* (May 6, 2021), https://tinyurl.com/48cdtrd2.  Avelo's first flight from its New Haven base occurred on November 3, 2021.

18.     Since its founding and throughout its growth, Avelo has fostered a team-oriented environment where each employee matters to the company, belongs to the crew, and cares for fellow employees.  This "One Crew Culture" forms the "bedrock of everything" Avelo does.  Avelo, *Careers*, https://tinyurl.com/yzzrh3pc (last visited Mar. 2, 2022).

## The AFA Applies to Represent Avelo's Flight Attendants

19.     On October 12, 2021, the Association of Flight Attendants-CWA ("AFA") filed an application with the NMB seeking a representation election among Avelo's Flight Attendants.  At that time, Burbank was Avelo's sole base of operations, although the New Haven base was scheduled to open just three weeks later.

20.     Pursuant to the Board's instructions, Avelo provided the Board with a list of the 32 Flight Attendants with an employee-employer relationship as of the eligibility cut-off date (September 30, 2021).  Avelo also submitted samples of the employees' signatures so the Board could verify the signatures on the authorization cards AFA submitted.

21.     Several weeks passed after Avelo's submission to the Board without any word from the Board about whether the union had met the showing of interest or whether an election would be held.

22.     During this period, Avelo's operations grew as a result of the opening of New Haven and the expansion of flying in Burbank.  Thus, by early January 2022,  the craft or class had grown to

approximately 65 Flight Attendants. During that same period, Avelo experienced significant turnover among the employees on the eligibility list. Specifically, 12 of the 32 Flight Attendants on the list had resigned or been terminated. Thus, only 20 out of Avelo's 65 Flight Attendants in the craft or class— about 30%—would be eligible to vote based on the original cut-off date of September 30, 2021.

### Avelo Requests that the NMB Modify the Eligibility Cut-off Date

23.      In light of the significant changes to the craft or class, on January 10, 2022 Avelo requested that the NMB modify the eligibility cut-off date. Avelo did <u>not</u> ask the NMB to change the cut-off date for the purpose of determining whether the AFA had met its threshold showing of support. Rather, Avelo's request was limited to modifying the cut-off date to permit all Flight Attendants to participate in the election, should the NMB authorize one.

24.      In support of its request, Avelo submitted documentation showing that 12 of the 32 Flight Attendants on the eligibility list were no longer with Avelo and thus ineligible to participate in the election. Avelo also provided the Board with a list of the 65 Flight Attendants in the craft or class as of January 19, 2022. Avelo argued that it would be unfair to disenfranchise nearly 70% of its Flight Attendants (45 out of 65) and that doing so would contradict the Board's statutory mandate to determine the representation wishes of a majority of the craft or class. Avelo cited the Board's earlier cases such as *Compass* to argue that the Board had previously modified the eligibility date to account for significant employee turnover and to safeguard the right of the majority of a craft or class to decide who would represent them.

25.      The AFA opposed Avelo's request to adjust the cut-off date and permit all Avelo Flight Attendants to have a voice in the representation election process. The AFA did not, however, contest that holding the election without modifying the eligibility cut-off date would prevent nearly 70% of Avelo's Flight Attendants from participating in the election.

**The Board Authorizes an Election Among a Clear Minority of Avelo's Flight Attendants**

26.     On February 15, 2022, in a 2-1 decision, the Board rejected Avelo's request to modify the cut-off date. *Avelo Airlines*, 49 NMB 26 (2022) (attached at Exh. A).

27.     The Board acknowledged that it was undisputed that 12 of the 32 Flight Attendants on the eligibility list had separated from Avelo (with two more having announced their upcoming departures) and that the craft or class had grown to 65. *Id.* at 30 & n.2.  It also admitted that the delay in authorizing an election was due to the NMB's transition back to mail balloting, and not anything that Avelo had done. *Id.* at 32.  Finally, it claimed to be "mindful of [its] statutory mandate 'to ensure that a majority of the craft or class has the opportunity to select a representative.'" *Id.*  Nevertheless, the majority somehow concluded these "few months of delay were not material to this case and did not create substantial turnover among the eligible employees." *Id.*

28.     Although the Board majority recognized that it had previously deviated from its cut-off date rule, it concluded that it did so "only in the face of unusual or extraordinary circumstances," which it found were not present here. *Id.* at 31.  The majority acknowledged that it had modified the cut-off date in *Compass* where Compass, like Avelo, was a start-up carrier that had experienced substantial growth since the union filed its representation application, such that some 70% of its flight attendants would have been disenfranchised in an election using the original cut-off date.  Despite the identical circumstances here, the Board majority concluded that it would not follow *Compass* because that decision was "expressly limited to the unique facts and circumstances present in [that] case and [did] not establish a precedent for handling of other representation cases." *Id.* at 33 (quoting *Compass*, 35 NMB at 21–22).

29.     NMB Chairman Fauth dissented.  He concluded that "unusual and extraordinary circumstances exist that warrant changing" the cut-off date to January 19, 2022, because without that modification, "only 30 percent of the Carrier's Flight Attendant craft or class will be eligible to vote

in the election." *Id.* at 35. As he explained, he could not "countenance an outcome where a significant majority of employees in the craft or class will not have their voices heard on whether or not they wish to be represented, particularly when the delay in the decision to authorize an election was of the Board's own making." *Id.* The decision to preclude 70% of Avelo's Flight Attendants from voting "silences" those Flight Attendants, and "as a result a clear minority of the craft or class will decide the representation question for the entire employee group." *Id.*

30.     Chairman Fauth further concluded that Avelo had appropriately relied on *Compass*, which "is very much a precedent  for changing a cut-off date in a matter involving a rapidly expanding start-up carrier." *Id.* He observed that there was "no meaningful distinction between the facts in *Compass* and those here particularly as they pertain to the expansion of the crafts or classes at issue and the periods of 'delay.'" *Id.* Indeed, he noted, the numbers of employees involved in both cases were "virtually identical," with 71% employee disenfranchisement there if the voter eligibility date had not been moved. *Id.* at 35–36. The Chairman further noted that the change in the cut-off date in both cases (about two and a half months in *Compass*; about three and a half months here) was "not a meaningful difference." *Id.* at 36. "Most significantly," he expressed concern that the Board's refusal to amend the cut-off date suggested a lack of concern "with ensuring majority participation in matters involving the substantial turnover of employees during the period prior to election authorization." *Id.* at 36.

31.     Despite the Chairman's concerns and without regard to the RLA's mandate to ensure majority employee participation in voting, the Board authorized an election using the original cut-off date of September 30, 2021. The voting period begins on March 2, 2022, the date on which the Board mails the ballots to the eligible Flight Attendants, and concludes on April 13, 2022, the date on which the Board conducts the vote count.

32.     Since Avelo made its request that the Board modify the eligibility cut-off date due to the substantial change in the craft or class, other Flight Attendants on the eligibility list have left Avelo's employ as well.  Now, 15 of the 32 Flight Attendants on the eligibility list (47%) are no longer eligible because of changes in their status.  Avelo informed the Board of these additional status changes on March 1, 2022.

33.     The Board's refusal to modify the cut-off date deprives a significant majority of Avelo's Flight Attendants of their right to participate in the voting process, and creates a risk that Avelo will be required to negotiate with a union that was not elected through a process in which a majority of its Flight Attendants were permitted to participate.

34.     On its face, the Board's decision flatly contradicts the RLA and grossly violates the Board's obligation to conduct elections to permit the "majority of any craft or class of employees … to determine who shall be the[ir] representative."  RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth; *see also Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 (D.C. Cir. 1994) (*en banc*) (holding that "gross violation[s]" of the RLA by the NMB are reviewable).

35.     Courts have long recognized that employers have a valid interest in ensuring that the RLA complies with its statutory obligations in the certification of a bargaining representative.  *See Zantop Int'l Airlines, Inc. v. Nat'l Mediation Bd.*, 732 F.2d 517, 520 (6th Cir. 1984) (citing *Int'l In-Flight Catering Co., Ltd. v. Nat'l Mediation Bd.*, 555 F.2d 712, 719 (9th Cir. 1977); *British Airways Board v. Nat'l Mediation Bd.,* 685 F.2d 52, 55 (2d Cir. 1982)).

## CLAIM FOR RELIEF

### Count I:
### Declaratory and Injunctive Relief Based on the Board's Gross Violation of the RLA

36.     Avelo incorporates by reference each of the preceding paragraphs as if restated herein.

37.     By conducting an election that excludes the vast majority of Avelo's Flight Attendants, the Board grossly violated the RLA-created right of a "*majority* of [the] craft or class of employees …

to determine who shall be the[ir] representative."  RLA Section 2, Fourth, 45 U.S.C. § 152, Fourth (emphasis added).

38.     Based on the Board's gross violation of its statutory obligation to conduct an election among a majority of a craft or class, the Court should find that any certification that the Board might issue in such an election is null and void; declare that Avelo would have no obligation to negotiate with any representative so certified; and that the Board must conduct an election in which a majority of Avelo's Flight Attendants are permitted to participate.

## PRAYER FOR RELIEF

WHEREFORE, Avelo respectfully requests that this Court issue the following declaratory and injunctive relief:

(a)     A declaration that the Board's decision to conduct a union election in which a substantial majority of Avelo's Flight Attendants were precluded from participating constitutes a gross violation of the RLA's majority participation requirement and the Board's obligation to conduct elections in compliance with the RLA;

(b)     A declaration that any certification issued by the Board in an election among Avelo's Flight Attendants that does not include the right of a majority of the craft or class to participate is null and void and that Avelo has no obligation to negotiate with any representative certified by the Board;

(c)     A mandatory injunction requiring the Board to conduct any election among Avelo's Flight Attendants in a manner that complies with the Board's statutory obligation to determine the representation wishes of a majority of the craft or class; and

(d)     Any and all other relief that the Court deems proper and just.

Dated:  March 2, 2022                    Respectfully submitted,

                                         /s/ Douglas W. Hall
                                         Douglas W. Hall
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C.  20001
                                         Telephone:  (202) 879- 5432
                                         Facsimile:   (202) 626-1700
                                         dwhall@jonesday.com

                                         *Counsel for Plaintiff Avelo Airlines, Inc.*